Nos. 10-5234/5235

————————————

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

————————————

DISCOUNT TOBACCO CITY & LOTTERY, INC., ET AL.,
Appellants/Cross-Appellees,

v.

UNITED STATES OF AMERICA, ET AL.,
Appellees/Cross-appellants.

————————————

Appeal from the United States District Court
for the Western District of Kentucky

————————————

**BRIEF OF AMICI CURIAE TOBACCO CONTROL LEGAL CONSORTIUM,
ROSWELL PARK CANCER INSTITUTE, AND PROFESSOR HARRY LANDO
IN SUPPORT OF APPELLEES/CROSS-APPELLANTS
UNITED STATES, ET AL.
IN SUPPORT OF AFFIRMANCE IN PART AND REVERSAL IN PART**

————————————

Seth E. Mermin
Thomas Bennigson
PUBLIC GOOD LAW CENTER
3130 Shattuck Ave.
Berkeley, CA 94705
(510) 393-8254

Counsel for Amici Curiae
Tobacco Control Legal Consortium, et al.

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS</u>
## <u>AND FINANCIAL INTEREST</u>

Amici Curiae Tobacco Control Legal Consortium, Roswell Park Cancer Institute, and Professor Harry Lando are nonprofit organizations or individuals that have no parent corporations, subsidiaries, or affiliates that have issued shares or debt securities to the public.

s/ Seth E. Mermin
Seth E. Mermin

## **INTEREST OF AMICI**

As experts on the health effects of tobacco use and the history of tobacco marketing, amici curiae are well positioned to provide the Court with an historical perspective on the pervasive deception that has characterized tobacco product development and product marketing in the United States, and on the grave health consequences of that deception.[1]

The Tobacco Control Legal Consortium is a national network of legal centers providing technical assistance to public officials, health professionals, and advocates in addressing legal issues related to tobacco and health, and supporting public health policies that will reduce the harm caused by tobacco use in the United States. The Consortium grew out of collaboration among specialized legal resource and public health centers serving six states and is supported by national advocacy organizations, voluntary health organizations, and others. The Consortium prepares legal briefs as amicus curiae in cases in which its experience and expertise may assist courts in resolving tobacco-related legal issues of national significance. The Consortium has submitted amicus briefs in cases before the U.S. Supreme Court; the U.S. Courts of Appeals for the Second and Fifth Circuits; the U.S. District Court for the District of Columbia; and the appellate courts of

---

[1] Pursuant to Fed. R. App. P. 29, amici have received the parties' consent to file this brief.

California, Delaware, Florida, Kentucky, Minnesota, Montana, New Hampshire, South Carolina, and Washington. The Consortium's activities are coordinated by attorneys at the Public Health Law Center at William Mitchell College of Law in St. Paul, Minnesota.[2]

Roswell Park Cancer Institute (RPCI), founded in 1898, is the nation's first cancer research, treatment and education center. RPCI collaborates with the nation's leading cancer centers to improve the effectiveness of cancer care delivery; to offer access to the latest, most promising clinical trials; and to provide the best practice guidelines and measurement tools. RPCI scientists were among the first to report the association between smoking and lung cancer in the 1950s and later sponsored the first public education campaigns on smoking and health in New York State. RPCI evaluates ways in which tobacco control policies can be used to promote public health, and its staff has authored several articles on the

---

[2] Other affiliated legal centers include the Technical Assistance Legal Center, a project of Public Health Law & Policy in Oakland, California; the Tobacco Advocacy Resource Partnership of the American Lung Association in Greenwood Village, Colorado; the Legal Resource Center for Tobacco Regulation, Litigation & Advocacy at the University of Maryland School of Law in Baltimore, Maryland; the Tobacco Control Resource Center, a project of the Public Health Advocacy Institute at Northeastern University School of Law in Boston, Massachusetts; the Smoke-Free Environments Law Project at the Center for Social Gerontology in Ann Arbor, Michigan; the Tobacco Control Policy and Legal Resource Center at New Jersey GASP in Summit, New Jersey; and the Center for Public Health and Tobacco Policy at New England Law | Boston, which provides technical assistance to communities in the state of New York.

subject of population-based tobacco control.  RPCI's tobacco control program is internationally recognized for its work trying to reduce the disease burden caused by tobacco products.

Professor Harry Lando, Ph.D., of the University of Minnesota's School of Public Health, Transdisciplinary Tobacco Use Research Center, and Cancer Center conducts research on nicotine addiction, global tobacco reduction issues, and public policy interventions to reduce the prevalence of smoking.  Since 1969 he has authored more than 180 scientific publications on these issues.  He was a scientific editor of the 1988 Report of the Surgeon General, "The Health Consequences of Smoking: Nicotine Addiction," and is Senior Editor of the journal Addiction.  Dr. Lando has consulted with many government and voluntary health agencies on tobacco control issues, is a past president of the Society for Research on Nicotine and Tobacco (SRNT), is a member of a number of tobacco research organizations, and co-chairs tobacco research committees, such as the Scientific Committee for the 15th World Conference on Tobacco OR Health.  He received the 2010 SRNT John Slade Award for outstanding contributions to public health and tobacco control through science-based public policy and public advocacy.

# **TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS ................................. i

INTEREST OF AMICI ........................................................ ii

TABLE OF AUTHORITIES ................................................... viii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................1

ARGUMENT ..................................................................4

I.    TOBACCO COMPANIES HAVE ENGAGED IN A DECADES-LONG
      CAMPAIGN TO DELIBERATELY MISLEAD THE PUBLIC AND THE
      GOVERNMENT ..........................................................4

      A.    Tobacco Companies Have Long Conspired To Conceal The Dangers
            Of The Products They Sell ......................................4

            1.    For Half a Century, The Industry Deceived Consumers About
                  The Link Between Smoking and Disease ......................4

            2.    The Tobacco Industry Misled the Public About The Addictive
                  Nature of Nicotine ........................................7

            3.    The Industry Engaged in Years of Deception About the Hazards
                  of Secondhand Smoke .......................................9

      B.    Tobacco Companies Have Relentlessly Deceived The Public About
            Allegedly Safer Versions Of Their Products .....................13

            1.    Filters ...................................................13

            2.    "Light" and "Low Tar" Cigarettes ..........................15

                  a.    "Light" cigarettes are not safer .....................16

                  b.    Tobacco companies have long known that "light" cigarettes
                        are not safer ........................................17

c.  Tobacco companies suppressed information about "light" cigarettes' lack of health benefit ..............................................18

d.  Tobacco companies have marketed "light" cigarettes as healthier alternatives ...............................................................19

e.  Tobacco companies have used public misconceptions about the benefits of "light" cigarettes to deter smokers from quitting and to recruit new smokers ...............................21

f.  Cigarette companies deliberately designed "light" cigarettes so that smokers would ingest sufficient nicotine, regardless of machine test yields ............................................................22

g.  Tobacco companies' efforts to mislead smokers about "light" cigarettes have been tragically successful ...................23

h.  Tobacco companies seek to circumvent restrictions on "light" labeling ......................................................................24

3.  PREPs and Smokeless Tobacco.....................................................25

II.  TOBACCO COMPANIES' PROVEN HISTORY OF FALSE AND MISLEADING SPEECH DIRECTED TO CONSUMERS ALLOWS CONGRESS GREATER LEEWAY TO REGULATE THEIR MARKETING ..........................................................................................29

A.  The MRTP Restrictions Do Not Violate the First Amendment Because They Do Not Affect Protected Speech .....................................31

1.  Specified Descriptors ....................................................................32

2.  Equivalents of Descriptors............................................................33

3.  Other Forms of Consumer-Directed Action ..................................34

B.  The Warning Labels Required By The Act Comport Fully With The First Amendment ...................................................................................35

CONCLUSION ............................................................................40

CERTIFICATE OF COMPLIANCE................................................41

# TABLE OF AUTHORITIES

<u>CASES</u>

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996)...................................................................36

*BellSouth Telecomm., Inc. v. Farris,*
   542 F.3d 499 (6th Cir. 2008)........................................................30

*Central Hudson Gas & Elec. Corp. v. Public Svce. Comm'n,*
   447 U.S. 557 (1980)................................................. 29, 30, 32, 35

*Douglas v. State,*
   921 S.W.2d 180 (Tenn. 1996) .....................................................38

*Entm't Software Ass'n v. Blagojevich,*
   469 F.3d 641 (7th Cir. 2006).................................................39, 40

*FDA v. Brown & Williamson Tobacco Corp,*
   529 U.S. 120 (2000)....................................................................38

*Florida Bar v. Went for It, Inc.,*
   515 U.S. 618 (1995)...............................................................2, 30

*Friedman v. Rogers,*
   440 U.S. 1 (1979).............................................................2, 31, 33

*Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.,*
   512 U.S. 136 (1994)..............................................................38, 39

*In re R.M.J.,*
   455 U.S. 191 (1982)..............................................................29, 30

*Joe Conte Toyota, Inc. v. Louisiana Motor. Veh. Comm'n,*
   24 F.3d 754 (5th Cir. 1994)..........................................................33

*Milavetz Gallop & Milavetz, P.A. v. United States,*
   130 S. Ct. 1324, 1340 (2010) ...............................................30, 32

*Milavetz Gallop & Milavetz, P.A. v. United States*,
    130 S. Ct. 1324, 1340 (2010)

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001).................................................................38

*New York State Rest. Ass'n v. New York City Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009)...............................................................37

*People v. Sottera, Inc.*,
    (Cal. Super. Ct., No. RG10528622) (Aug. 3, 2010) ........................25

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005)..............................................................38

*Riley v. Nat'l Fed'n for the Blind*,
    487 U.S. 781 (1988)...........................................................................36

*United States v. Philip Morris USA, Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ..................................................*passim*

*United States v. Philip Morris USA, Inc.*,
    449 F.Supp.2d 1 (D.D.C. 2006) ..................................................*passim*

*Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976)...........................................................................36

*Whitaker v. Thompson*,
    353 F.3d 947 (D.C. Cir. 2004) ..........................................................32

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)........................................... 35, 36, 37, 38, 39, 40

## STATUTES

7 U.S.C. § 136a.......................................................................................32

21 U.S.C. § 360e......................................................................................32

27 U.S.C. § 205(e) ................................................................................32

Family Smoking Prevention and Tobacco Control Act,
    Pub. L. No. 111-31, 123 Stat. 776 (2009)...............................*passim*

Mich. Comp. Laws § 324.8307a .........................................................32

Ohio Rev. Code Ann. § 921.02 ..........................................................32

OTHER AUTHORITIES

David Burns, Statement before H.R. Committee on Government Reform,
    June 3, 2003 (2003 WL 21280495)..................................................27

Carrie Carpenter et al., *Developing Smokeless Tobacco Products for Smokers:*
    *An Examination of Tobacco Industry Documents*,
    18 Tobacco Control 54 (2009) ........................................................27

Gregory Connolly, *The Marketing of Nicotine Addiction by One Oral Snuff*
    *Manufacturer*,
    4 Tobacco Control 73 (1995) ..........................................................28

K. Michael Cummings et al., *What Do Marlboro Light Smokers*
    *Know About Low-Tar Cigarettes*?,
    6 [Supp. 3] Nicotine & Tobacco Research S323 (2004)............................17, 23

FTC Cigarette Report for 2006 (2009),
    http://www.ftc.gov/os/2009/08/ 090812cigarettereport.pdf............................23

Becky Freeman et al., The Case for the Plain Packaging of Tobacco
    Products 13 (2007)
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id =100464.........................25

Keith Haddock et al., *Evidence That Smokeless Tobacco Use Is a Gateway for*
    *Smoking Initiation in Young Adult Males*, 32 Preventive Medicine 262
    (2001) ..........................................................................................28

William Hamilton et al., *Smokers' Responses to Advertisements for Regular*

*and Light Cigarettes and Potential Reduced-Risk Tobacco Products*,
6 [Supp. 6] Nicotine & Tobacco Research S353 (2004).....................20, 21, 24

Jeffrey Harris, *Incomplete Compensation Does Not Imply Reduced Harm*, 6
Nicotine & Tobacco Research 797 (2004) ......................................................16

Richard Hurt & Channing Robertson, *Prying Open the Door to the Tobacco
Industry's Secrets About Nicotine*,
13 JAMA 1173 (1998)...................................................................................20

Adrienne Mejia et al., *Quantifying the Effects of Promoting Tobacco as a Harm
Reduction Strategy in the USA*,
19 Tobacco Control 297 (2010) ...............................................................26, 28

National Cancer Institute, Smoking and Tobacco Control Monograph 19,
*The Role of the Media in Promoting and Reducing
Tobacco Use* 77 (2008),
http://cancercontrol.cancer.gov/tcrb/monographs/19/ index.html........23, 26, 28

National Cancer Institute, Smoking and Tobacco Control Monograph 13,
*Risks Associated with Smoking Cigarettes with Low Machine-Measure
Yields of Tar and Nicotine* 200 (2001),
http://cancercontrol. cancer.gov/tcrb/ monographs/13/index.html............*passim*

National Cancer Institute, Smoking and Tobacco Control Monograph 2,
*Smokeless Tobacco or Health: An International Perspective* (1992),
http://cancercontrol.cancer.gov/tcrb/monographs/2/ index.html....................27

Linda Pederson & David Nelson, *Literature Review and Summary of Perceptions,
Attitudes, Beliefs, and Marketing of Potentially Reduced Exposure Products*,
9 Nicotine & Tobacco Research 525 (2007) ...................................................26

R.W. Pollay & T. Dewhirst, *The Dark Side of Marketing Seemingly "Light"
Cigarettes*,
11 Tob. Control (Supp. I) i18 (2002) .................................................13, 14, 15

Saul Shiffman et al., *Smokers' Beliefs About "Light" and "Ultra Light"
Cigarettes*, 10 [Supp. 1] Tobacco Control i17 (2001) .....................................23

Claude E. Teague, Jr., *Research Planning Memorandum*, 7 (1972),
http://tobaccodocuments.org/rjr/500915670-5679.html ...................................18

WHO, *Tobacco: Deadly in Any Form or Disguise* (2006),
http://www.who.int/tobacco/communications/events/wntd/2006/
Tfi_Rapport.pdf ........................................................................................21, 24

Duff Wilson, *Coded to Obey Law, Lights Become Marlboro Gold*,
N.Y. Times (Feb. 19, 2010),
http://www.nytimes.com/2010/02/19/business/19smoke.html .................24, 25

*Youth and Tobacco: A Report of the Surgeon General* (1995),
http://profiles.nlm.nih.gov/NN/B/C/L/Q/_/nnbclq.pdf ...................................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

For more than half a century, tobacco companies have engaged in an unrelenting campaign to deceive the American public and the United States government about the health effects of their deadly products. The companies have denied the lethal effects of smoking, of secondhand smoke, and of smokeless tobacco use. They have targeted their advertising at youth to replenish the supply of smokers and manipulated the levels of nicotine in their products to ensure that users remain addicted. And through it all they cynically offered a series of allegedly less harmful innovations—from filters to "light" cigarettes to new "smokeless" products—that in fact, when used, were no safer at all, but that dissuaded smokers from ending their use of tobacco. The campaign of deception has involved the suppression of scientific evidence, the hiding and destruction of documents, and the enlistment of supposedly objective research institutions and scientific experts paid by tobacco companies to sow doubt and confusion.

When Congress passed the Family Smoking Prevention and Tobacco Control Act (FSPTCA), Pub. L. No. 111-31, 123 Stat. 776 (2009), it adopted measures that responded directly to the particular abuses, as well as the

scope and severity, of the tobacco industry's campaign.[3]  The law constrains precisely the fraudulent activities which the tobacco industry employed to entice consumers, especially young people, to use and continue to use tobacco products, while concealing and misrepresenting the likelihood of illness, addiction and death.  *See United States v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1, 912 (D.D.C. 2006), *aff'd in relevant part,* 566 F.3d 1095 (D.C. Cir. 2009) (laying out details, following nine-month RICO trial, of tobacco industry's "long history of denial and deceit" with references to internal industry documents obtained during litigation).[4]

Because of this history, the remedial marketing constraints of the FSPTCA are subject to more lenient First Amendment scrutiny.  The fraud and concealment they seek to counter reduces or removes the constitutional protection afforded "commercial speech."  *See Friedman v. Rogers,* 440 U.S. 1 (1979); *Florida Bar v. Went for It, Inc.,* 515 U.S. 618 (1995).  Two

---

[3] Two of the plaintiffs in this action, Lorillard Tobacco Co. and R.J. Reynolds Tobacco Co., were among the defendants found liable in the RICO conspiracy.  Among the other plaintiffs in this action, American Snuff Co. is a sister corporation of R.J. Reynolds; National Tobacco was formed in 1988 to acquire the smokeless tobacco division of Lorillard; and Commonwealth Brands is a sister corporation of the British American Tobacco Company (later, BATCo), another defendant found liable in *Philip Morris*.  The remaining figurehead plaintiff, Discount Tobacco City & Lottery, appears to be a small retailer.

[4] The per curiam affirmance by the D.C. Circuit was issued by Judges Sentelle, Brown and Tatel.  The tobacco companies' petitions for rehearing en banc were denied, as were their five separate petitions for certiorari.

measures bear particular mention.  The requirement for pre-approval of "modified risk tobacco products" (MRTP) products, section 911, and the mandate of new warnings on package labels, section 201, both directly address the tobacco companies' campaign to prevent consumers from giving up smoking.  The consequences of the campaign were deadly: untold thousands of smokers would have quit entirely, and lived longer lives, but for the tobacco companies' deceptive marketing of "mild" and "low-tar" alternatives, and their efforts to prevent effective warnings.

With respect to MRTPs, the RICO decision determined that tobacco companies' speech about "lights" and other allegedly reduced risk products was actually and inherently misleading.  The court's decision extends not only to specified terms but to their equivalents, and not only to traditional advertising but to alternatives like public relations campaigns, claims by industry-controlled "institutes," and other media appearances.  All of these were part of the deceptive campaign to sell tobacco; all may now, consistent with the First Amendment, be included in a legislative attempt to help remedy the effects of that campaign.

The labels mandated by Congress readily meet the constitutional requirements for mandatory warnings:  they are reasonably related to the government's interest in preventing ongoing deception, the information they

contain is factual and noncontroversial, and they are neither unjustified nor unduly burdensome.

It was the tobacco companies who turned seemingly straightforward terms like "lights" into misleading Orwellian caricatures; it was they who so corrupted the market for MRTPs that the only way to make it safe was to require FDA approval beforehand; it was they who through deception and manipulation created the need for the graphic warning labels.

The FSPTCA is an appropriate response to a continuing catastrophe.

## ARGUMENT

### I. TOBACCO COMPANIES HAVE ENGAGED IN A DECADES-LONG CAMPAIGN TO DELIBERATELY MISLEAD THE PUBLIC AND THE GOVERNMENT.

#### A. Tobacco Companies Have Long Conspired To Conceal The Dangers Of The Products They Sell.

##### 1. For Half a Century, The Industry Deceived Consumers About The Link Between Smoking and Disease.

In 1954 the major tobacco companies responded to increasing public awareness of scientific research linking smoking to disease by launching a coordinated, heavily funded campaign trumpeting the companies' "paramount" concern for public health, while maintaining—as they would continue to do in the face of all evidence for the next forty years—that the relation between smoking and disease was an "open question," requiring further research.  *Philip Morris*, 449 F.Supp.2d at 36.

4

To demonstrate their concern, the companies publicized the new Tobacco Industry Research Committee (TIRC) (later the Council for Tobacco Research-U.S.A. (CTR)), whose stated purpose was "to aid and assist research into tobacco use and health." *Id.* at 39-42. In reality, TIRC was "a sophisticated public relations vehicle—based on the premise of conducting independent scientific research—to deny the harms of smoking and reassure the public." *Id.* at 41. Between 1954 and 1999 the tobacco companies provided close to half a billion dollars in funding to TIRC/CTR, *id.* at 46, which along with the industry-controlled Tobacco Institute "conducted the manufacturers' joint public relations through false and misleading press releases and publications … and funded [projects] to produce favorable research results." *Philip Morris*, 566 F.3d at 1107.

Although by the time of the Surgeon General's Report in 1964 there was scientific consensus—confirmed by the industry's own internal research—that smoking poses serious health risks, for decades thereafter the companies continued to "insist[] that there was a scientific controversy and dispute[] scientific findings linking smoking and disease knowing their assertions were false." *Philip Morris*, 449 F.Supp.2d at 180; *see id.* at 192 (1969 Tobacco Institute advertisement attacking American Cancer Society

warnings about risks of smoking, saying such "wild" unsupported statements should not be permitted on air).

The contrast between tobacco companies' internal memos and their public pronouncements is stark. Already in 1958 Philip Morris' head of research wrote: "the evidence … is building up that heavy cigarette smoking contributes to lung cancer." *Philip Morris,* 449 F.Supp.2d at 167. In 1964 the company's Vice-President of Research and Development reported that there was "little basis for disputing the findings" of the Surgeon General's report. *Id.* at 180. Yet the company "maintain[ed]—for another thirty-five years—its public position that the causal link between smoking and health was an 'open question.'" *Id.* In 1997 Philip Morris' CEO declared that cigarettes are not a cause of lung cancer, and that if they were shown to be, he would "probably … shut [the] company down instantly." *Id.* at 205.

Similarly, at Reynolds, a 1953 in-house research report stated: "Studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and incidence of cancer of the lung"); *see also id.* at 167 (Reynolds scientist's 1962 report: "Obviously, the amount of evidence accumulated to indict cigarette smoke as a health hazard is overwhelming. The evidence challenging this indictment is scant"). Yet Reynolds advertised in 1984: "Studies which conclude that smoking causes

disease have regularly ignored significant evidence to the contrary." *Id.* at 201.

Moreover, contrary to their avowals that they "always have and always will cooperate closely with those whose task it is to safeguard the public health," *id.* at 39, the companies did everything they could to suppress findings of disease causation. To name only a few examples:

- 1966: A Philip Morris report showing cigarette smoke inhalation to lead to higher rates of emphysema in animals was marked "[n]ot to be taken from this room" and never released. *Id.* at 180.

- 1960s: After Philip Morris's President complained about Reynolds research demonstrating that smoking causes emphysema, the entire Reynolds research division was suddenly closed, years of research destroyed, all 26 resident scientists fired, and lab notebooks taken by the legal department. *Id.* at 182.

- 1970s: After the head of an industry-funded program studying responses of lab animals to tobacco smoke refused to modify his findings, his funding was cut off because he was "getting too close to some things." *Id.* at 183.

### 2.    The Tobacco Industry Misled the Public About The Addictive Nature of Nicotine.

The tobacco industry has for many decades responded with similar denial and obfuscation to the long-established fact that the nicotine in cigarettes is addictive, while simultaneously seeking to profit from that fact. As recently as 2004 the CEO of Reynolds stated that the company would not agree that nicotine is an addictive drug. *Id.* at 287. In 1994 CEOs of

American Tobacco and Liggett denied under oath to a Congressional committee that nicotine is addictive. *Id.* at 278, 280-81. Tobacco company spokespeople have continually made light of nicotine addiction with frivolous comparisons. *Id.* at 280 (Lorillard Senior Vice President, 2001: smoking is as addictive as "sugar and salt and Internet access"); *id.* at 273 (Philip Morris chair, 1997: attachment to cigarettes is like not "lik[ing] it when I don't eat my Gummi Bears").

Executives and scientists of all the major tobacco companies knew that these denials were false "decades before the scientific community did." *Philip Morris*, 449 F.Supp.2d at 208. *See also id.* at 239 (BAT scientific director, 1962: "[W]e now possess a knowledge of the effects of nicotine far more extensive than exists in published scientific literature," ); *id.* at 263 (1978 B&W memo: "Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison").

As with the link between smoking and disease, industry knowledge was carefully concealed. For example, in the early 1980s Philip Morris's CEO prohibited staff scientists from publishing studies of nicotine addiction in rats, commenting: "Why should I risk a billion-dollar industry on rats pressing a lever to get nicotine?" *Id.* at 294.

Moreover, tobacco companies relied cynically on the fact that the denials were false.  *See id.* at 238 (1959 BATCo memo: "To lower nicotine too much might end up destroying the nicotine habit in a large number of consumers and prevent it from ever being acquired by new smokers"); *id.* at 291 (1977 Philip Morris memo labeled "CONFIDENTIAL": without nicotine "the cigarette market would collapse, P.M. would collapse, and we'd all lose our jobs and consulting fees"; *id.* at 235 (1982 Reynolds memo: if future smokers were able to stop smoking when they wanted, Reynolds would "go out of business").  Tobacco companies did not just passively profit from the addictiveness of nicotine, but actively "engineered their products around creating and sustaining this addiction."  *Philip Morris*, 566 F.3d at 1107.

### 3. The Industry Engaged in Years of Deception About the Hazards of Second-Hand Smoke.

The story of secondhand smoke unfolds similarly.  By 1961 industry scientists were aware that secondhand smoke contains carcinogens.  *Philip Morris*, 449 F.Supp.2d at 709.  In following years, they became "increasingly persuaded of the strength of … research showing the dangers of ETS [environmental tobacco smoke] to nonsmokers."  *Id.* at 800; *see also id.* at 709 (Philip Morris scientist suggested ways to attack 1980 paper

demonstrating secondhand smoke causes significant damage to airway function, while privately acknowledging, "I can find little to criticize.  The authors have put together an excellent paper").

The industry view was that "perception is everything," and executives recognized that "[t]he task of altering public perception" would be challenging, given "overwhelming adverse information" and an absence of favorable "objective science."  *Id.* at 733 (notes of 1987 ETS conference of top industry executives).

The industry again publicly trumpeted its desire to learn the truth and to fund independent research, while privately working "to undermine independent research [and] to fund research designed and controlled to generate industry-favorable results, and to suppress adverse research results."  *Id.* at 723.

To further this agenda, "the manufacturers jointly created the Center for Indoor Air Research ('CIAR') to coordinate and fund their secondhand smoke research with the appearance of independence."  *Philip Morris*, 566 F.3d at 1108.  Though CIAR's publicly stated purpose was "to sponsor scientific and technical research" on indoor air issues, *id.* at 738, in a private letter its chair described its function as being "to provide ammunition" for legal and public relations battles over secondhand smoke.  *Philip Morris*,

449 F.Supp.2d at 725.  From 1988 through 1999, CIAR funded 150 projects "for the purpose of establishing industry-favorable science," while generally concealing the connection to the tobacco industry.  *Id.* at 742.  *See also id.* at 741 (Philip Morris scientist noting advantages of using CIAR to fund research "so as to 'hide' industry involvement"; letter from counsel discussing advantages of CIAR membership for BATCo and B&W: "In terms of scientific acceptability, CIAR provides a further buffer between the Company and the third party, yet allows strong control of projects").

Tobacco companies used "a vast array of foreign or international entities to conduct their sensitive secondhand smoke research [and] generate 'marketable science' to use for public relations purposes."  *Philip Morris*, 566 F.3d at 1108.  One such entity was described internally by BATCo: "The aim . . . is defensive research aimed at throwing up a smoke screen and to throw doubt on smoking research findings which show smoke causes diseases."  *Id.* at 730.  The Center for Cooperation in Scientific Research Relative to Tobacco (CORESTA), still operating and still influential, *see* National Cancer Institute, Smoking and Tobacco Control Monograph 13, *Risks Associated with Smoking Cigarettes with Low Machine-Measure Yields of Tar and Nicotine* 200 (2001), *available at* http://cancercontrol. cancer.gov/tcrb/monographs/13/index.html at 165, was described in a 1992

BATCo document as "very valuable," because "[i]t is perceived as being objective, technical and independent." *Id.* at 136.

Tobacco companies and their front organizations also "identified, trained, and subsidized 'friendly' scientists through their Global Consultancy Program, and sponsored symposia all over the world … featuring those 'friendly' scientists, without revealing their substantial financial ties" to the industry. *Id.* at 800-01. Presentations from those symposia were then publicized as "independent scientific statements," demonstrating apparent ongoing scientific controversy about whether ETS was hazardous. *Id.* at 768. Tobacco company representatives "closely supervised and, when necessary, altered" research results. *Id.* at 777. The industry promoted favorable research that it knew was flawed, *see id.* at 766-67, 779-80, while seeking to suppress or discredit genuine findings. *See id.* at 742 (memos discussing attempts to "get the study shelved altogether," or "kill the credibility of the research").

Surreptitiously industry-funded scientists also regularly intervened to criticize proposed regulation. *See id.* at 791-93 (concerted campaign against EPA's proposed Risk Assessment on ETS; consultants, at industry direction, submitted "independent" critical comments, without disclosing industry

affiliation, "foster[ing] the impression that a large number of scientists existed who, independent of the tobacco industry, opposed the proposal").

Appallingly, "there is credible evidence that the ETS Consultancy Program is still operational." *Id.* at 799.

### B. Tobacco Companies Have Relentlessly Deceived The Public About Allegedly Safer Versions Of Their Products.

For a half century tobacco companies have responded to public health concerns by marketing supposedly less risky alternative products, all the while knowing that those products were not in fact any safer.

#### 1. Filters.

In the 1950s, when many consumers first heard of the possibility of fatal health risks associated with smoking, the industry responded with the first of its allegedly "modified risk" innovations: the filter. R.W. Pollay & T. Dewhirst, *The Dark Side of Marketing Seemingly "Light" Cigarettes*, 11 Tob. Control (Supp. I) i18, i18 (2002). "The purported product benefit of this new filtration was obviously the perceived reduction, if not elimination, of cancer and other health risks." NCI Monograph 13 at 200 (2001). The FTC found in 1964 that "much filter and menthol-filter advertising seeks to persuade smokers and potential smokers that smoking cigarettes is safe." *Id*. Filters' health benefits were implied through such slogans as "Just What the

Dr. Ordered," "The Secret to Life is in the Filter," "Inhale to your Heart's Content," *id.*, and "Double-Barreled Health Protection." Pollay & Dewhirst, *supra*, at i18-i19.

Filters were promoted as a "technological fix" to what the industry called "the health scare." Tobacco companies would dramatically announce new "scientific discoveries; modern pure materials; research and development breakthroughs; certification by the American Testing Company [with official-looking seal suggesting a government agency, Pollay & Dewhirst, *supra*, at i18], and implied endorsement by the American Medical Association." NCI Monograph 13 at 200.

Later, explicit health claims were replaced by "thinly veiled language ('hospital white' filters; 'Alive with Pleasure') and visual 'pictures of health' images." NCI Monograph 13 at 231.

The tobacco companies well knew that in fact filters seldom provide health benefits. Internal industry documents from the 1970s described 1950s filters as merely 'cosmetic.' Pollay & Dewhirst, *supra*, at i19 (Reynolds' attorneys noted that "advertising claims to the contrary aside, earlier filtered cigarettes had deliveries equal to or in excess of their unfiltered cousins.") It was the perception that mattered. According to a 1966 Philip Morris marketing report, "The public had been conditioned to accept the filtering

effects of charcoal in other fields, and when charcoal was added to cigarette filters it proved to be an effective advertising gimmick." *Id.*

Companies would establish a brand as providing effective filtration, but then introduce successive "new and improved" versions that each delivered *more* tar and nicotine. *Id.* at 232. As B&W marketers put it, "once the consumer had been sufficiently educated on the virtues of filters, a vacuum was created for a filter with taste [i.e., one providing more tar and nicotine]." Pollay & Dewhirst, *supra*, at i18 (quoting 1976 B&W document).

As summarized in a 1966 Philip Morris memo: "The illusion of filtration is as important as the fact of filtration…." Pollay & Dewhirst, *supra*, at i20.

Marketing of filtered products was and remains misleading, but—as would prove the case with later "modified risk" products—highly effective. From 1945 to 1953 the proportion of cigarettes sold with filters rose from 3% to 70% of the market. *Philip Morris*, 449 F.Supp.2d at 526.

### 2.    "Light" and "Low Tar" Cigarettes.

As the dangers of smoking became increasingly recognized, tobacco companies in the late 1960s presented their newest attempt to reassure smokers: so-called "light" or "low tar/nicotine" cigarettes. As clearly

established by National Cancer Institute Monograph 13 in 2001, and well
known to the industry for decades before that, "light" cigarettes are not
safer, and in practice do not deliver less tar or nicotine, than other cigarettes.

### a.    "Light" cigarettes are not safer.

"Light" cigarettes are defined according to tests performed on
machines that simulate smoking.  Yet actual smokers' intake of tar and
nicotine from such cigarettes does not correspond to machine measurements.
First, in order to satisfy their nicotine addiction, smokers of "light" cigarettes
unconsciously compensate by inhaling more deeply and more frequently.
NCI Monograph 13 at 18-19.  As a result, "lights" smokers may actually
obtain *higher* dosages of some toxic substances.  Jeffrey Harris, *Incomplete
Compensation Does Not Imply Reduced Harm*, 6 Nicotine & Tobacco
Research 797 (2004).  Second, one of the principal ways manufacturers
achieve lower yields is through filter vents, small perforations that dilute
inhaled smoke with air.  NCI Monograph 13 at 17.  However, actual
smokers will naturally block a substantial proportion of the vents with their
lips and fingers, thus inhaling much more concentrated smoke.

Finally, cigarette companies have deceived consumers by advertising
"phantom brands" with very low yields, but producing them in such small
volumes that they are rarely found in the marketplace, while widely selling a

version of the same brand with much higher tar content. *Philip Morris*, 449

F.Supp.2d at 517.  A  Philip Morris executive testified about one such brand:

"the plan all along was to deceive the public into thinking that the

Cambridge Light cigarette was a low tar cigarette, when in fact it was not."

*Id.*

As Judge Kessler concluded, "[T]he terms 'Light' and "Low Tar" "are

essentially 'meaningless.'"  *Id*.

### b.  Tobacco companies have long known that "light" cigarettes are not safer.

Tobacco companies "have known for decades that filtered and low tar

cigarettes do not offer a meaningful reduction of risk, and that their

marketing … was false and misleading."  *Philip Morris*, 566 F.3d at 1124.

Already in 1967 a Philip Morris memo noted that "smoking machine

data appear to be erroneous and misleading," because "the human smoker …

appears to adjust to … diluted smoke by taking a larger puff so that he still

gets about the same amount of equivalent smoke."  K. Michael Cummings et

al., *What Do Marlboro Light Smokers Know About Low-Tar Cigarettes*?, 6

[Supp. 3] Nicotine & Tobacco Research, S323, S324 (2004).  A 1972

Reynolds memo marked "CONFIDENTIAL" noted: "Given a cigarette that

delivers less nicotine than he desires, the smoker will subconsciously adjust

his puff volume and frequency, and smoking frequency, so as to obtain …

his … requirement for nicotine."  Claude E. Teague, Jr., *Research Planning Memorandum*, 7 (1972), *available at* http://tobaccodocuments.org/rjr/ 500915670-5679.html.

Philip Morris's former Director of Applied Research testified in the RICO trial that data indicated the product design for Marlboro Light cigarettes was actually "predictive of *more* potential cancer risk" than found in 'full flavor' Marlboros."  449 F.Supp.2d at 456 (emphasis added). Moreover, tobacco companies had "a greater understanding of compensation than the outside scientific community" and the government.  *Id.* at 461 (explaining that the industry knew the FTC testing method was inaccurate even before it was implemented).

### c.    Tobacco companies suppressed information about "light" cigarettes' lack of health benefit.

Notwithstanding their repeated expressions of concern for public health, "as part of [a] scheme to defraud smokers, [tobacco companies] withheld and suppressed their extensive knowledge and understanding of nicotine-driven smoker compensation."  *Philip Morris*, 566 F.3d at 1125. *See id.* at 501 (1967 Tobacco Institute press release complaining FTC machine measurements "may be deceptive" because a smoker's cigarette may "be delivering much *less*, the way he smokes" (emphasis added); *id.* at 503-04 (1997 joint tobacco industry comments to FTC opposing warnings

about compensatory smoking because the companies were "not convinced that compensatory smoking behavior is a sufficiently common or documented phenomenon that consumers should be alerted to its existence"; William Hamilton et al., *Smokers' Responses to Advertisements for Regular and Light Cigarettes and Potential Reduced-Risk Tobacco Products (PREPS)*, 6 [Supp. 6] Nicotine & Tobacco Research S353, S354 (2004) (B&W Vice President, 1980: "It would not serve the industry well for smokers to understand that their actual smoking behavior undermines their intent in choosing low-tar products").

Tobacco companies continue to try to hide the lack of health benefits of "light" cigarettes.   In 2003 Altria and Reynolds opposed shareholder proposals that the companies inform customers about the actual health risks of smoking 'light and ultra light.'" *Philip Morris,* 449 F.Supp.2d. at 528-29, 537.  In 1999 B&W attempted to delay publication of independent findings that its ultra light cigarettes delivered three times the quantity of tar advertised.  *Id.* at 539.

> ### d.   Tobacco companies have marketed "light" cigarettes as healthier alternatives.

Despite knowing that "light" cigarettes offered no health benefit, tobacco companies "engaged in massive, sustained, and highly sophisticated

marketing and promotional campaigns to portray their light brands as less harmful than regular cigarettes." *Philip Morris*, 566 F.3d at 1124.

Early ads for "low tar" cigarettes emphasized that they would reduce exposure to the "controversial" elements of cigarette smoke. *Philip Morris*, 449 F.Supp.2d at 430. After the FTC in 1966 prohibited representations that light cigarettes reduced health hazards, *id.* at 434, references to health benefits became more oblique. *See id.* at 531 (Reynolds advertised "low-tar" cigarettes for smokers "seriously concerned about the alleged hazards of smoking"); *id.* at 509 ("mild taste" used as "euphemism" to suggest that products were lower in tar and nicotine and therefore safer).

Internal industry documents make clear the intention to market "light" cigarettes as (impliedly) less harmful. *See*, *e.g.*, Richard Hurt & Channing Robertson, *Prying Open the Door to the Tobacco Industry's Secrets About Nicotine*, 13 JAMA 1173, 1178 (1998) (1977 BAT marketing conference summary: "All work in this area should be directed towards providing consumer reassurance… by claimed low deliveries, by the perception of low deliveries and by the perception of 'mildness'"); Hamilton, *supra*, at S353 (1977 B&W study: "Almost all smokers agree that the primary reason for the increasing acceptance of low 'tar' brands is the health reassurance they seem to offer").

### e. Tobacco companies have used public misconceptions about the benefits of "light" cigarettes to deter smokers from quitting and to recruit new smokers.

Most tragically, cultivation of the impression that "light" cigarettes are safer "has given smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting." *Philip Morris*, 449 F.Supp.2d at 430. *See also WHO, Tobacco: Deadly in Any Form or Disguise*, 28 (2006), *available at* http://www.who.int/tobacco/communications/events /wntd/2006/Tfi_Rapport.pdf ("well intentioned efforts by public health organizations and governments to address the needs of continuing smokers [with "light and mild" cigarettes] were used by the industry as a marketing tool to stimulate initiation in non-smokers and perpetuate tobacco use in existing smokers").

Notwithstanding industry denials, company documents confirm a deliberate strategy to induce smokers not to quit. *See, e.g.*, *Philip Morris*, 449 F.Supp.2d at 496 (1986 B&W memo: "Quitters may be discouraged from quitting, or at least kept in the market longer"); NCI Monograph 13 at 221 (1985 BATCo memo: "It is useful to consider lights more as a third alternative to quitting and cutting down").

###### f. Cigarette companies deliberately designed "light" cigarettes so that smokers would ingest sufficient nicotine, regardless of machine test yields.

Cigarette companies did not just passively profit from the disparity between machine-tested yields and amounts actually ingested by smokers. They sought to design cigarettes to enhance the disparity as much as possible, so that they could market cigarettes as "light" while ensuring that they still delivered sufficient "kick." *See*, *e.g.*, NCI Monograph 13 at 31 (1984 BAT document: "Irrespective of the ethics involved, we should develop alternative designs (that do not invite obvious criticism) which will allow the smoker to obtain significant enhanced deliveries should he so wish"); *id.* (1980s BAT document: "[I]n order to reinforce the primary pleasures of smoking, I have proposed to make it easier for smokers to take what they want from a cigarette which might well have a low delivery when smoked by a machine").

Tobacco companies succeeded in designing cigarettes that would deliver high yields to smokers while measuring low yields by the FTC machine method. *Philip Morris*, 449 F.Supp.2d at 339, 351-74 (ammonia added to lower the acidity of cigarette smoke, resulting in easier absorption into the body; filter vents strategically placed where they would be most likely to blocked by smokers' lips or fingers).

### g.    Tobacco companies' efforts to mislead smokers about "light" cigarettes have been tragically successful.

The marketing of "light" cigarettes as "health reassurance" products has worked all too well.  Low tar brands now account for 92.7% of the cigarette market, FTC Cigarette Report for 2006 7 (2009), *available at* http://www.ftc.gov/os/2009/08/ 090812cigarettereport.pdf, in large part because they are believed to be less dangerous. Cummings, *supra*, at 331 (majority of Marlboro Lights smokers believe addition of filters and lowering of tar yield in cigarettes has made smoking less hazardous).  *See also* Saul Shiffman et al., *Smokers' Beliefs About "Light" and "Ultra Light" Cigarettes*, 10 [Supp. 1] Tobacco Control i17, i21 (2001) (many smokers believe "lights" reduce tar yield by factors of 2 (Lights) or 3 (Ultra Lights)).

The tobacco industry's success in perpetuating the illusion that "light" cigarettes are less harmful has been aided by public belief that health claims are monitored by government regulators.  *See* National Cancer Institute, Smoking and Tobacco Control Monograph 19, *The Role of the Media in Promoting and Reducing Tobacco Use* 77 (2008), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/19/ index.html (regarding light cigarette marketing in the 1970s: "[c]onsumers likely assumed that governmental agencies would not permit the use of deceptive health claims").  Indeed, two-thirds of participants in a 2002 survey believed that if

23

an advertisement claimed that a cigarette contains less dangerous substances, a government agency had to approve the claim.  Hamilton, *supra*, at S360.

### h.    Tobacco companies seek to circumvent restrictions on "light" labeling.

Tobacco companies appear determined to circumvent the restrictions on labels such as "lights": "[T]obacco companies plan to use packaging to make those same distinctions: light colors for light cigarettes."  Duff Wilson, *Coded to Obey Law, Lights Become Marlboro Gold*, N.Y. Times (Feb. 19, 2010), *available at* http://www.nytimes.com/2010/02/19/business/19smoke.html.  Philip Morris will be renaming Marlboro Lights as Marlboro Gold, and Marlboro Ultra Lights as Marlboro Silver; Reynolds has already renamed Salem Ultra Lights as Silver Box.  *Id.*  Though an Altria spokesman claimed that colors are used to identify brands, not to make any claims about safety, "study after study—including ones by the industry disclosed in tobacco lawsuits—has shown consumers believe the terms and colors connote a safer product.  Moreover, adults believe cigarette packs with the terms 'smooth,' 'silver' or 'gold' are also easier to quit than other ones, and teenagers said they were more likely to try them."  *Id.*  In many other countries tobacco companies have already responded to bans on use of terms like "light" and "low tar" by conveying the same ideas through color-coded packaging, supported by marketing campaigns.  WHO, *supra*, at 28; Becky

Freeman et al., The Case for the Plain Packaging of Tobacco Products 13 (2007), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id =1004646.

### 3.    PREPs and Smokeless Tobacco.

More recently, tobacco companies have responded to continuing health concerns, the threat of litigation, and the increasing prevalence of smoke-free spaces by marketing a variety of new "potential reduced-exposure tobacco products" ("PREPs"), including cigarettes with modified tobacco and electronic cigarettes that heat tobacco instead of burning it, as well as new smokeless tobacco products such as dissolvable tobacco lozenges and spitless moist snuff known as "snus." They have also expanded marketing of older forms of smokeless tobacco. It may take decades to learn what tobacco companies know about these products that is hidden from regulators and the public. The situation is ominously familiar. *See, e.g., People v. Sottera, Inc.* (Cal. Super. Ct., No. RG10528622) (Aug. 3, 2010) (California AG judgment against electronic cigarette maker barring deceptive health claims), *available at* http://ag.ca.gov/cms_attachments/ press/pdfs/n1965_sottera_consent_judgment.pdf.

Like filters and "lights," these products are marketed with vague assertions or implications that they are less harmful than conventional

tobacco products.  Linda Pederson & David Nelson, *Literature Review and Summary of Perceptions, Attitudes, Beliefs, and Marketing of Potentially Reduced Exposure Products*, 9 Nicotine & Tobacco Research 525, 529 (2007).  *See* NCI Monograph 19 at 310 (Reynolds marketed Advance, a modified tobacco cigarette, with slogan "Great taste.  Less toxins").  In 2007 a Reynolds website claimed that Eclipse, a heated-tobacco product, "responds to concerns about certain illnesses caused by smoking, including cancer," *id.* at 111, though Eclipse produces tar levels similar to those of light cigarettes already on the market.  Pederson & Nelson, *supra*, at 532.  In a 2004 study, 91% of smokers who were read claims made by Reynolds about Eclipse afterwards believed that Eclipse was safer than conventional cigarettes, while 24% believed Eclipse was *completely* safe.  *Id.* at 530.  Generally, at least half of smokers believe that PREPs are safer.  *Id.* at 532.  Philip Morris and Reynolds even petitioned the FDA in 2009 to endorse a tobacco harm reduction strategy focusing on smokeless tobacco.  Adrienne Mejia et al., *Quantifying the Effects of Promoting Tobacco as a Harm Reduction Strategy in the USA*, 19 Tobacco Control 297, 297 (2010).

However, while tobacco companies defend smokeless tobacco as a less harmful alternative to smoking, they market it primarily "to augment cigarette use when smoking is not possible," with such slogans as "You can

Snus virtually anywhere."   Carrie Carpenter et al., *Developing Smokeless Tobacco Products for Smokers: An Examination of Tobacco Industry Documents*, 18 Tobacco Control 54, 57-58 (2009).  *See also id.* at 56 (2003 Reynolds smokeless cigarette marketing memo: "There is a need to clearly position the product as a *situational* substitute for cigarettes, rather than a replacement").  Far from weaning smokers from cigarettes, smokeless products allow them to maintain their nicotine addiction when circumstances make smoking difficult.  *See* Statement of David Burns, editor of NCI Monograph 13, before H.R. Committee on Government Reform, June 3, 2003 (2003 WL 21280495).  Companies also market smokeless to consumers who would otherwise not use tobacco.  *See* Carpenter, *supra*, at 55 (quoting 1981 BAT memo: entering smokeless tobacco market could "produce extra business" in part "from those who would not take up smoking, but could enjoy a smokeless product with nicotine satisfaction").

Marketing smokeless tobacco to smokers for "dual use" is particularly worrisome.  Beyond the dangers that smokeless products pose on their own—smokeless tobacco is a leading cause of disease in countries where it is widely used, National Cancer Institute, Smoking and Tobacco Control Monograph 2, *Smokeless Tobacco or Health: An International Perspective*, 315 (1992), available at http://cancercontrol.cancer.gov/tcrb/monographs/2/

27

index.html—it is unknown to what extent dual use might pose additional dangers. *See* Mejia, *supra*, at 303 ("the health effects of concurrent (dual) use … may be additive or even synergistic, may increase the risk of tobacco-related diseases and mortality").

Several studies have found that ads for PREPs and smokeless tobacco products reduce smokers' interest in quitting by assuaging their health concerns. NCI Monograph 19 at 461. Indeed, far from weaning smokers away from cigarettes, smokeless tobacco tends to lead users to take up smoking. *See*, *e.g.*, *Youth and Tobacco: A Report of the Surgeon General*, 36 (1995), *available at* http://profiles.nlm.nih.gov/NN/B/C/L/Q/_/nnbclq .pdf; Keith Haddock et al., *Evidence That Smokeless Tobacco Use Is a Gateway for Smoking Initiation in Young Adult Males*, 32 Preventive Medicine 262 (2001).

As with conventional cigarettes, tobacco companies foster addiction by manipulating smokeless tobacco with chemicals for faster and stronger nicotine delivery, and by marketing mild flavored smokeless products to non-users and then "graduating" them to increasingly strong products. Gregory Connolly, *The Marketing of Nicotine Addiction by One Oral Snuff Manufacturer*, 4 Tobacco Control 73, 73-78 (1995) (citing industry documents).

## II.   TOBACCO COMPANIES' PROVEN HISTORY OF FALSE AND MISLEADING SPEECH DIRECTED TO CONSUMERS ALLOWS CONGRESS GREATER LEEWAY TO REGULATE THEIR MARKETING.

The tobacco companies' decades-long, judicially established record of deceiving consumers bears directly on the contours of First Amendment protection to which their advertising and promotion are currently entitled. Because the record of deceit involved an entire industry, the government has leeway to impose industry-wide restrictions that might in other circumstances be impermissible.  The unremittingly misleading conduct has created an unusual situation, one in which much of the companies' "commercial speech" has been rendered entirely outside the realm of constitutional protection.

Commercial speech which is "false or misleading" receives no First Amendment protection.  *Central Hudson Gas & Elec. Corp. v. Public Svce. Comm'n*, 447 U.S. 557, 563 (1980) ("the government may ban forms of communication more likely to deceive the public than to inform it"). Although restrictions on speech that is "potentially misleading" must be examined under the full *Central Hudson* test, commercial speech that is "inherently likely to deceive or . . . has in fact been deceptive" receives no such protection.  *In re R.M.J.*, 455 U.S. 191, 202 (1982).

"Actually misleading" speech encompasses expression that has been "subject to abuse" or "proved to be misleading in practice." *In re R.M.J.*, 455 U.S. at 203, 207. If the government can show a "record indicat[ing] that a particular form or method of advertising has in fact been deceptive," *id.* at 202, it may "freely regulate." *Florida Bar*, 515 U.S. at 624.

As the Supreme Court has recently confirmed, not only actually misleading but also "inherently misleading" advertisements may be freely regulated. *Milavetz Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1340 (2010) (survey or other evidence of consumers' actually having been misled not necessary "[w]hen the possibility of deception is . . . self-evident"); *accord FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 391-392 (1965). The speech may be banned where it offers "numerous" avenues for deception and where the concerns with deception are "not speculative or hypothetical but based on experience . . . with which the legislature was familiar." *Friedman v. Rogers*, 440 U.S. 1, 13 (1979); *accord Milavetz*, 130 S. Ct. at 1340 (sufficient that congressional record contains evidence demonstrating pattern of deceptive advertising). When "the particular content or method of the advertising suggests that it is inherently misleading," the "advertising may be prohibited entirely." *In re R.M.J.*, 455

U.S. at 202-03; *accord BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008).

### A. The MRTP Restrictions Do Not Violate the First Amendment Because They Do Not Affect Protected Speech.

For decades tobacco companies "engaged in massive, sustained, and highly sophisticated marketing and promotional campaigns to portray their light brands as less harmful than regular cigarettes," despite having known "for decades that filtered and low tar cigarettes do not offer meaningful reduction of risk, and that their marketing which emphasized reductions in tar and nicotine was false and misleading." *Philip Morris*, 449 F.Supp.2d at 860.

In direct response to these pervasive and ongoing practices, Congress forbade the sale and marketing of "modified risk tobacco products" (MRTPs) whose actual beneficial effect on smokers and nonsmokers has not first been determined by the FDA. FSPTCA § 911. The law's broad definition of MRTPs was necessitated by the tobacco industry's protean marketing and product development schemes, seeking to evade each attempt to regulate tobacco products by concealing data, creating new products, and marketing old products in new ways.

Even if analyzed as a restraint on speech,[5] the MRTP restrictions do not implicate the First Amendment.  Any regulated expression is actually or inherently misleading commercial speech that receives no constitutional protection.  *Central Hudson*, 447 U.S. at 563.

## 1.    Specified Descriptors.

The Act's prohibition on the sale or marketing of unapproved tobacco products bearing the words "'light', 'mild', or 'low' or similar descriptors," FSPTCA § 911(b)(2)(A)(ii), involves speech that tobacco companies' promotional practices have made both actually and inherently misleading. Judge Kessler's voluminous findings on the use of such terms, *Philip Morris*, 449 F.Supp.2d at 430–561, and Congress's own findings, 21 U.S.C. § 387 (Note), more than confirm that they are "actually misleading."  *See Milavetz*, 130 S. Ct. at 1340; *see also Philip Morris*, 449 F.Supp.2d at 938

---

[5] The use of marketing goals to define regulated products should be of no First Amendment concern.  The MRTP review parallels the requirement that a particular substance be approved by the Food & Drug Administration before it can be sold as a drug.  *See Whitaker v. Thompson*, 353 F.3d 947, 948 (D.C. Cir. 2004); *see also* 21 U.S.C. § 360e (pre-approval for medical devices); 7 U.S.C. § 136a (pre-market pesticide review); Ohio Rev. Code Ann. § 921.02 (same), Mich. Comp. Laws § 324.8307a (same); 27 U.S.C. § 205(e) (alcoholic beverage label review).  A business that does not wish to make drug or health claims about a given product need not get FDA approval before entering the market.  *Whitaker*, 353 F.3d at 953.  A company that does not plan to market its products as reducing the risk of tobacco use need not obtain FDA pre-approval either.  FSPTCA § 911(b)(2)(A).

(issuing injunction, undisturbed on appeal, wholly prohibiting use of any term that "reasonably could be expected to result in a consumer believing that smoking the cigarette brand using that descriptor may … be less hazardous to health").  Further, the use of terms like "lights" has been so pervasively deceptive that the descriptors themselves have lost any useful meaning and become "inherently misleading"—even for companies not themselves involved with the historical abuse or subject to the RICO injunction.  *See Friedman*, 440 U.S. at 12-13; *see also Joe Conte Toyota, Inc. v. Louisiana Motor. Veh. Comm'n*, 24 F.3d 754, 756-57 (5th Cir. 1994) (term "invoice" in auto sales was without First Amendment protection because of historical abuse and inherent lack of meaning).

## 2.    Equivalents of Descriptors.

The exception to First Amendment protection extends readily to the FSPTCA's broader proscription on unapproved products whose "label, labeling, or advertising" represents that the product "presents a lower risk of tobacco-related disease or is less harmful" than other tobacco products, "contains a reduced level of a substance or presents a reduced exposure to a substance," or "does not contain or is free of a substance."  Section 911(b)(2)(A)(i).  These are precisely the representations which the tobacco industry made through four decades of deceit.  Against this history, any

similar statement would be infected by the same deception. Because the tobacco companies' campaign was not limited to the specified terms, any effective response to that campaign must be similarly broad and flexible.

### 3.    Other Forms of Consumer-Directed Action.

The bar on selling or distributing unapproved products as to which plaintiffs have taken "any action directed to consumers . . . that would be reasonably expected to result in consumers believing that the tobacco product or its smoke may present a lower risk of disease or is less harmful," § 911(b)(2)(A)(iii), addresses misleading commercial speech that receives no constitutional protection. Like the other requirements, the third definition of products requiring pre-approval flows directly from the tobacco companies' own past conduct. The standard set forth in subsection (iii) precisely echoes findings by Congress and in the RICO case that tobacco companies used many channels other than traditional advertising—including public relations campaigns, pseudo-scientific reports, and an array of front organizations—to influence the public.

> [Commercial speech] can include material representations
> about the efficacy, safety, and quality of the advertiser's
> product, and other information asserted for the purpose of
> persuading the public to purchase the product. . . . [Tobacco
> companies'] various claims—denying the adverse effects of
> cigarettes and nicotine in relation to health and addiction—
> constitute commercial speech. [Tobacco companies]
> disseminate their fraudulent representations about the safety

> of their products, both in formats that do and those that do not
> explicitly propose a particular commercial transaction, in
> attempts to persuade the public to purchase cigarettes.

*Philip Morris*, 566 F.3d at 1144.  The actions "directed to consumers"

involve only commercial speech that has been adjudged to be misleading.

### B.    The Warning Labels Required By The Act Comport Fully With The First Amendment.

The tobacco industry's history of deception must equally inform any

assessment of the warnings that must now be placed on packages of tobacco

products.  Because the new warnings convey "factual and uncontroversial"

information, are "reasonably related" to the government's interest in

countering decades of deception in tobacco marketing, and are neither

"unjustified" nor "unduly burdensome"—the only relevant standards, *see*

*Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985)—they

accord fully with the First Amendment.

Plaintiffs and their amici argue for a number of heightened standards.

App. Br. at 16, 19 (proposing "strict scrutiny"); WLF Br. at 28 (applying full

*Central Hudson* test); Advertisers' Br. at 26 (citing noncommercial speech

cases applying strict scrutiny).  But the Supreme Court has already

established the proper standard.

When, as here, the government requires commercial speakers to

disclose "purely factual and uncontroversial information," the relevant

question is simply whether "the disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.  The reason for the relatively lenient inquiry is that when government "requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion); *see also Zauderer*, 471 U.S. at 651 n.14 ("the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed"); *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 n.24 (1976) (it is "appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive").

There is a single additional limitation:  the government should avoid "unjustified or unduly burdensome disclosure requirements [that] might offend the First Amendment by chilling protected commercial speech." *Zauderer*, 471 U.S. at 651.

The relevant inquiry, then, is straightforward: First, is the "information" contained in the new warnings "factual and uncontroversial"? Plaintiffs do not contend otherwise. Objections to the *manner* of communication – for example, the graphic illustrations or the size of the warnings – are not challenges to the *information* conveyed and do not make that information "subjective" or "controversial." App. Br. at 27.[6]

Second, are the warnings reasonably related to the government's interest in preventing deception of consumers?" Assuredly so. The text of the warnings directly addresses deceptive or outright false statements made by the tobacco industry over the past half century. The pictorial warnings similarly respond to decades of denial and obfuscation by tobacco manufacturers about the physical harm caused by tobacco products. Though the warnings may further other government interests as well—under *Zauderer*, preventing deception is a sufficient, but not necessary, interest,[7]

---

[6] The attempt to assert otherwise by invoking *Riley v. Nat'l Fed'n for the Blind,* 487 U.S. 781 (1988) is misplaced. Advertisers' Br. at 26. *Riley* involved only the *noncommercial* speech standard; the Court observed that "[p]urely commercial speech is more susceptible to compelled disclosure requirements." 487 U.S. at 796 n.9. The tobacco packaging at issue here involves only commercial speech.

[7] Contrary to the assertion of amici, Advertisers' Br. at 25, prevention of deception is not the only valid basis for governmental disclosure requirements. *See New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) ("*Zauderer's* holding was broad enough to encompass … disclosure requirements" not concerned with

*see Nat'l Elec. Mfrs. Ass'n v. Sorrell (NEMA)*, 272 F.3d 104, 115 (2d Cir. 2001)—they are at the very least reasonably related to accomplishing the government's goal of preventing consumer deception.

Finally, are the new warnings "unjustified" or "unduly burdensome" such that they would "chill" commercial speech about tobacco products? The decades of deceptive marketing of tobacco products, *Philip Morris*, 449 F.Supp.2d at 208-839, the ongoing deception involving certain products, *id.* at 507-08, and the grave health risks faced by those who use tobacco, *FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120, 134-35 (2000), amply justify the warnings. The burden on plaintiffs' marketing is not "undue." Nor have plaintiffs pointed to any aspect of their commercial speech that would be "chilled" (i.e., deterred) by the warnings.

Plaintiffs' proffered cases do not support a contrary conclusion. In *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146-47 (1994), the Court found that a lawyer-accountant's speech would be chilled—she physically could not and would not make justified claims about her status as a CPA and CFP—if she were compelled to add to her business cards and letterhead certain required lengthy disclaimers). *See also Douglas v. State*,

---

preventing consumers from being misled); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (finding "no cases limiting *Zauderer*" to "potentially deceptive advertising").

921 S.W.2d 180, 188 (Tenn. 1996) ("[W]e read *Ibanez* to mean that the disclaimer violated the First Amendment simply because it was 'unduly burdensome' under the *Zauderer* analysis"). The Court took into account the specifics of Ms. Ibanez's conduct (she had no record of misconduct), *id*. at 144, the location of the proposed text, *id*. at 146, and the language of the disclaimers, *id*. at 147. Any inquiry into the same parameters here reveals that the tobacco package warnings are not "unduly" onerous. The potential harm and the history of deception, in particular, are simply of a qualitatively different scale.

The disapproval of video game warnings in *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006), is no more apposite. Most saliently, *Blagojevich* applied strict scrutiny rather than the more lenient standard that *Zauderer* dictates be applied here. *Id.* at 646, 652-53 (finding that warning stickers and signs contained not factual information but rather "subjective and highly controversial" opinion). Indeed, the *Blagojevich* court explicitly distinguished the then-extant cigarette warning-label regime.[8]

---

[8] Other aspects of *Blagojevich* make it an especially inapt resource. The court adduced instances of factual commercial speech in illustrating its conclusions about the entirely separate standard for compelled opinion, *id.* at 652 (raw shellfish warning on restaurant menu), and examined only noncommercial cases to support its analysis of what appears to have been

Tobacco warning labels *are* different.  This is not merely a disclosure of adult content as in *Blagojevich* or of certification standards as in *Ibanez*. This is an urgent message, delivered in an effective manner.

## CONCLUSION

The history of deceit in tobacco marketing required a comprehensive remedial response.  In these circumstances, the First Amendment poses no bar.  The marketing provisions of the FSPTCA should be upheld.

August 4, 2010                     Respectfully submitted,


                                   s/ Seth E. Mermin
                                   Seth E. Mermin
                                   Thomas C. Bennigson
                                   PUBLIC GOOD LAW CENTER
                                   3130 Shattuck Ave.
                                   Berkeley, CA 94705
                                   510-393-8254
                                   Attorneys for Amici Curiae
                                   Tobacco Control Legal Consortium et al.

---

commercial speech.  *Id.* at 653 (warning signs).  Moreover, the court never even analyzed whether the speech at issue was commercial or noncommercial—that is, whether the *Zauderer* regime should have applied at all.  *Id.*; *compare Philip Morris*, 566 F.3d at 1143 (properly applying commercial speech standard).

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Fed. R. App. P. 29(d), the attached amicus brief is proportionately spaced, has a type space of 14 points, and contains 8249 words.

The typeface is Times New Roman 14 point, prepared using Microsoft Word.

Aug. 4, 2010                              <u>s/ Seth E. Mermin</u>
                                          Seth E. Mermin

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of August, 2010, I caused the foregoing brief to be filed and served through the Court's ECF system. All counsel of record are registered ECF users.

s/ Thomas Bennigson
Thomas Bennigson